# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DIANE ISRAEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 5271 |
| | ) | |
| ALAN ISRAEL, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Diane Israel seeks to collect payment on a Promissory Note ("Note") executed by her brother Defendant Alan Israel. The parties do not dispute that Alan signed the Note on July 13, 2005 and that, to date, he has failed to make any payments. Plaintiff has moved for judgment on the pleadings [29] pursuant to Federal Rule of Civil Procedure 12(c) and seeks an award of $380,534.07. In response to Plaintiff's motion, Defendant makes arguments based on three affirmative defenses: (1) that Diane did not provide consideration for the Note, (2) that a general release signed by the parties in 2000 bars this action, and (3) that Defendant signed the note under economic duress. Defendant also seeks leave to file his Second Amended Affirmative Defenses [36]. The court grants that motion. Because Defendant has not addressed four of his seven affirmative defenses at all in his briefs, and because the three he has presented lack merit, Plaintiff's motion for judgment on the pleadings [29] is granted.[1]

---

[1] Defendant's Second Amended Affirmative Defenses presents seven defenses. (Second Am. Affirmative Defenses [36-1].) Four of those defenses are not addressed in his briefs to the court, and the court concludes they lack merit: Defendant has asserted that Diane's failure to bring this action earlier gives rise to the defense of estoppel and laches. Although labeled "estoppel," Defendant argues that the Note is unenforceable because Diane failed to present it for payment within a reasonable period of time. (2AD ¶ 81) ("No claim was asserted to compel payment of the Promissory Note at the time the Note came due or for approximately seven years after the alleged default . . . As a result, Plaintiff's [sic] is estopped from asserting Defendant is in default.") But Defendant waived any defenses related to the presentment requirement: The Note states that Alan waived "presentment, protest and demand, notice of protest, demand and dishonor and nonpayment." (Answer [24], ¶ 9.) This

(continued . . .)

## **BACKGROUND**

Diane Israel seeks to collect payment on a Promissory Note ("Note") executed by her brother Alan Israel. (Compl. [1], Count One; Promissory Note, Ex. A to Compl. [1], hereinafter "Note.") Alan signed and delivered the Note on July 13, 2005, promising to pay Diane $182,000, plus interest at a rate of 3.45%, on December 31, 2006. (Answer [24], ¶ 6.) The Note further provided that if the amount due was not paid in full by December 31, 2006, the interest rate would increase to 10% per annum. (Answer ¶ 7.) Alan has not made any payments on the Note. (Answer ¶ 12.) The total amount due under the Note as of March 11, 2014 (the date that Diane filed this lawsuit) is $380,534.07. (Ex. 4 to Pl.'s Mem. in Supp. of Her Mot. for J. on the Pleadings [30].)

Alan contends there was no consideration for the Note and that it is barred by a release agreement that Diane had executed years earlier. Alan nevertheless signed the Note, he asserts, because he was under extreme economic pressure from his father, Aaron Israel, to settle a dispute that had simmered for years, arising out of a business that Diane, Alan, and Aaron had formed in 1998: American Care Corp., Inc., ("ACC"). (Second Am. Affirmative Defenses, Ex. 1 to Def.'s Mot. for Leave to File Second Am. Affirmative Defenses [36-1], hereinafter "2AD," ¶ 3.) ACC was formed to build a residential development on a tract of land in Ankeny, Iowa. (2AD ¶ 3.) Shortly after the corporation was formed, Alan underwent surgery, leaving Diane to manage the day-to-day business of the corporation. (2AD ¶ 10.) When he

---

language in the Note also defeats Defendant's laches defense: "neither laches or waiver is applicable to commercial paper such as the promissory note sued upon where . . . all parties thereto waived presentment for payment, notice of dishonor, protest and notice of protest." *Pedott v. Dorman*, 192 Ill. App. 3d 85, 94, 548 N.E.2d 541, 547 (1st Dist. 1989). Defendant's suggestion that Diane is not the "real party in interest" (Second Am. Affirmative Defenses at ¶¶ 67–68) is unsupported. Diane is the party named in the Promissory Note. (Promissory Note, Ex. A to Compl. [30] at ¶ 1.) Finally, Defendant asserts that if Diane receives payment on the Note, she will be unjustly enriched. (Second Am. Affirmative Defenses ¶¶ 82–83.) This argument is merely an extension of Alan's claim that the note lacks consideration; as the court concludes that argument fails, it need not discuss his purported unjust enrichment defense.

returned from surgery, Defendant accused Diane of mismanaging the company's finances in his absence. (2AD ¶¶ 11–14.) Diane maintains that the expenditures were neither inappropriate nor excessive, but the two reached an agreement to settle the dispute: Diane agreed to leave the company and re-pay some of the allegedly misappropriated funds. (2AD ¶ 15.) Alan and Diane, each represented by counsel, engaged in negotiations for Diane's separation from the company, ultimately reaching an agreement in December 2000. (2AD ¶¶ 15–17, 30.) The agreement was memorialized in a Stock Purchase Agreement and a Mutual General Release. (2AD ¶¶ 31, 33.) Under its terms, Diane agreed to sell her shares of ACC to the corporation for the "purchase price." (Stock Purchase Agreement, Ex. 3 to Pl.'s Mem. of Law in Supp. of Her Mot. for J. on the Pleadings, hereinafter "SPA," ¶ 2.) The purchase price was defined in the SPA as:

> $32,000 plus interest on the $32,000 at the rate of 9% per annum from January 1, 2001 until the purchase price is paid in full, plus an amount equal to 5% of any net proceeds with a maximum of $500,000 to be paid to [Diane] for her share of net proceeds.

(SPA ¶ 2.) The purchase price only became due "once there are net proceeds in excess of $100,000 from the Project." (SPA ¶ 2.) Although the agreement called for Diane to sell her shares to the corporation (ACC), Alan personally guaranteed payment of the purchase price: "The Other Shareholder [Alan] shall be liable to the Seller for the purchase price if Purchaser [ACC] fails to pay it within 15 days after it becomes due." (SPA ¶ 2.)

> At the same time, Alan and Diane signed a Mutual General Release, under which,
>
> [e]xcept as provided in the Stock Purchase Agreement, the Seller [Diane] . . . hereby release[s] and forever discharge[s] and covenants not to sue the Company Parties [Alan and ACC] from and with respect to any and all actions, claims, liabilities, obligations, controversies, or causes of action of any kind or nature for relief or remuneration whatsoever, known or unknown, fixed or contingent, recorded or unrecorded, whether accruing or arising prior to and including the date of this Release, or at any time in the future, including, but not limited to, claims arising out of or in any way connected with the Purchaser [ACC], the relationship of the parties, the Stock Purchase Agreement, the Project, and /or any other matter.

(Mutual General Release, Ex. 2 to Pl.'s Mem of Law in Supp. of her Mot. for J. on the Pleadings,

hereinafter "Mutual General Release," ¶ 7(b).)

But this was not the end of the Israels' dispute. Early on in the life of the corporation, Alan and Diane's father, Aaron Israel, had made two loans to ACC, the first in August 1998 for $1.6 million (2AD ¶ 4), and the second in December 1998 for an additional $950,000. (2AD ¶ 6.) Neither loan was secured. (2AD ¶ 9.) In 1999, as part of the negotiations between Alan and Diane for Diane's separation from ACC, Diane's attorney, Bruce Bell, requested that Aaron receive a first mortgage on the Iowa property in order to secure Aaron's loans. (2AD ¶¶ 23–25; Mar. 15, 1999 Letter, Ex. 3 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "Mar. 15, 1999 Letter," 1.) It appears that, around the same time, Aaron was attempting to sever his ties with ACC (the parties do not explain why) and, as part of the separation, Aaron, through Bell, demanded repayment of his loans only a few months after he made them. (Mar. 15, 1999 Letter at 1.) A month after Aaron demanded a security interest, Bell, apparently representing both Aaron and Diane, demanded immediate repayment of the loans and threatened that if Aaron did not receive payment, he would foreclose on the property. (April 30, 1999 Letter, Ex. 8 to Decl. of Louis Hockenberg, Ex. A to 2AD, 1.) Alan did not agree to the mortgage, but in June 1999 Diane, acting as Secretary of ACC, executed the necessary documents to grant Aaron a mortgage on the property. (2AD ¶¶ 26–27.)

Alan negotiated with several outside lenders to obtain financing in order to pay off the loans from Aaron and to continue developing the property. (2AD ¶ 36.) Aaron's mortgage on the property was a stumbling block in these efforts because outside lenders were unwilling to loan money to ACC when its main asset—the property—was already encumbered by the mortgage. (2AD ¶ 29.) Alan concluded that before he could obtain financing, he needed to negotiate with Aaron to know how much Aaron would demand in exchange for releasing the mortgage. (2AD ¶ 37.)

By 2005,[2] Alan and Aaron reached an agreement: Alan would repay the principal on the loans and some amount of interest and Aaron would release the mortgage. According to Alan, they reached an agreement on June 8, 2005 in a meeting at the offices of Attorney Bruce Bell, who was still representing both Aaron and Diane. (2AD ¶¶ 38–39; *See* Def.'s Response in Opp. to Pl.'s Mot. for J. on the Pleadings [43], hereinafter "Resp.," 21–22.) At the June 8 meeting, Alan agreed to (1) repay the principal on both loans, through a one-time payment of $2.55 million, (2) make an interest payment of $268,154, and (3) pay an additional $25,000 once Alan obtained a loan from an outside lender. (2AD ¶¶ 38–39.) The agreement was not reduced to writing at the meeting, but the next day, June 9, 2005, Bruce Bell sent a letter to Alan's attorney, Louis Hockenberg, in which, "based on our discussions with Alan and Aaron," Bell confirmed the terms that "the two have agreed to." (2AD ¶ 40; June 9, 2005 Letter, Ex. 12 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "First June 9, 2005 Letter," 2.) The letter confirmed that Alan[3] agreed to pay Aaron $2.55 million towards the principal of the loans, $268,154 for interest accrued, and an additional $25,000 when Alan eventually closed on a loan from an outside lender. (2AD ¶ 41; First June 9, 2005 Letter at 2.)

Later the same day, however, Bruce Bell responded to Hockenberg with a letter changing the terms of the agreement. (2AD ¶ 42; June 9, 2005 Letter, Ex. 13 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "Second June, 9, 2005 Letter," 1.) Bell, on behalf of Aaron, now demanded $700,000 in interest. (2AD ¶ 43; Second June 9, 2005 Letter.) Hockenberg responded on June 13, 2005, asserting that Aaron and Alan had reached an

---

[2] The pleadings state that Aaron began demanding repayment in 1999, but that the final agreement was not reached until 2005. Neither party has explained what happened in the intervening years.

[3] Although Aaron made the loans to ACC, the letters describe the 2005 agreement as between Aaron and Alan personally. (*See e.g.*, First June 9, 2005 Letter at 1, 2) ("The following will summarize our comments on the two transactions between Alan and Aaron Israel . . . Based on our discussions with Alan and Aaron, the following are the terms that the two have agreed to.")

5

enforceable agreement at the June 8, 2005 meeting at Mr. Bell's office, which was confirmed in Bell's first June 9, 2005 letter. (2AD ¶ 44; June 13, 2005 Letter, Ex. 14 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "June 13, 2005 Letter.") Aaron's refusal to honor the terms of that agreement, Hockenberg continued, would constitute a breach, and Hockenberg urged Aaron to perform under the original terms. (2AD ¶ 44; June 13, 2005 Letter.) When he received no response by June 22, 2005, Hockenberg sent another letter notifying Aaron and Bruce Bell that "there is a certain urgency in closing the transaction" because Alan, relying on the June 8, 2005 agreement, had already hired a contractor and had sold lots of the residential development. (2AD ¶ 45; June 22, 2005 Letter, Ex. 15 to Decl. of Louis Hockenberg, Ex. A to 2AD.) On June 24, 2005, Bruce Bell finally responded, announcing that Aaron was withdrawing entirely from the agreement because "Aaron has no interest in pursuing a deal with Alan at this time." (2AD ¶ 46; June 24, 2005 Letter, Ex. 16 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "June 24, 2005 Letter.") In the same letter, Mr. Bell again demanded repayment of the two loans Aaron had made to ACC and acknowledged that Aaron would execute a release for the mortgage once he received full repayment of the loans. (2AD ¶ 47; June 24, 2005 Letter.)

Alan had obtained loans from State Central Bank and Valley Bank that were set to close on July 7, 2005.[4] (See 2AD ¶ 48.) On July 6, 2005, Alan attempted to perform his obligation under the June 8, 2005 agreement. (2AD ¶ 48.) Louis Hockenberg wrote to Bruce Bell to inform him that the $2.55 million principal payment and $268,154 of interest would be paid to Aaron by wire transfer upon the closing of the loan the following day. (July 6, 2005 Letter, Ex. 17 to Decl. of Louis Hockenberg, Ex. A to 2AD.) It appears that Aaron rejected his proposal;

---

[4] Alan states that he, broadly, started looking for outside financing in 1999 when Aaron first began demanding repayment. (2AD ¶ 26.) Alan's pleadings do not say when he completed negotiating the State Central Bank and Valley Bank loans. It appears to the court that Alan was negotiating with the Banks at roughly the same time he was negotiating with Aaron.

following further discussion, Hockenberg wrote again to Bruce Bell confirming a different agreement, one more favorable to Aaron and including Diane for the first time: Aaron and Diane would continue to hold the mortgage, but it would be subordinate to the banks' mortgages. (2AD ¶ 49; July 6, 2005 Letter, Ex. 18 to Decl. of Louis Hockenberg, Ex. A to 2AD, hereinafter "Second July 6, 2005 Letter," 1–2.) Hockenberg urged that "it is imperative that the closing take place as scheduled, as the contractor has indicated that the work cannot be completed in order to deliver the sold lot on time unless construction starts this week." (Second July 6, 2005 Letter at 2.) In response, Bell told Hockenberg that Aaron would only agree to release[5] the mortgage at the closing if he received $710,000 in interest payments at that time. (2AD ¶ 51.) Alan alleges that he "had little choice" but to agree to the increased interest amount because he needed the financing to develop the property. (2AD ¶ 52.) Alan contends that this was the "final agreement" reached between Alan and Aaron. (2AD ¶ 53.) Then, according to Alan, once this final agreement was reached, Bruce Bell came back again asking for more. This time, he told Hockenberg that Aaron would not release the mortgage unless Alan agreed to pay Diane an additional $182,000 for the purchase of Diane's stock in ACC. (2AD ¶ 54.) Although Alan initially refused, he ultimately succumbed in response to Bell's warning that Aaron would not release the mortgage at the closing the next day unless Alan agreed to the additional $182,000 payment to Diane. (2AD ¶ 59.) The result was a 2005 Settlement Agreement (2005 Settlement Agreement, Ex. 19 to Decl. of Louis Hockenberg, Ex. A to 2AD), and the Note at issue in this lawsuit.

Alan maintains that his refusal to sign the Note "would have left Alan Israel and his

---

[5] In his Second Amended Affirmative Defenses, Alan maintains that Bruce Bell refused to "release" the mortgage without the increased interest payment. (2AD ¶ 51.) The parties' earlier agreement contemplated that Diane and Alan would retain the mortgage, but would subordinate it. (*See* 2AD ¶ 49; Second July 6, 2005 Letter.) There is no letter or other writing attached to the pleadings that confirms Bruce Bell's renewed amenability to release—rather than subordinate—the mortgage.

family in financial ruin." (2AD ¶ 57.) Without the release of Aaron's mortgage on the property, the banks would not have provided financing for the development, and without that financing, Alan would have been unable to repay Aaron's loans. (*Id.*) Aaron had threatened to foreclose on the property unless he was repaid, and Alan feared that ACC would lose the property if Alan refused to sign the note; that would leave ACC unable to generate revenue and Alan himself liable for hundreds of thousands of dollars in unpaid development costs. (*Id.*) Alan believed that any legal recourse to enforce the June 8, 2005 agreement would "require years of litigation, cost thousands of dollars in attorney's fees, and would not provide an adequate remedy because the Property and the money to develop the property would be lost by the time the litigation was resolved." (2AD ¶ 58.) And, even if he had gone to court to enforce the June 8, 2005 agreement, Alan observed, he would have had to pay the development costs while the litigation was pending. (2AD ¶ 58.) Given this confluence of factors, Alan alleges that he "was deprived of his ability to exercise his free will regarding whether he should sign the Promissory Note, and he thereby lacked the mental capacity required to" to enter into a valid contract. (2AD ¶ 59.) After signing the Note, Alan made no payments. Several years later—after yet another family dispute not related to this action—Diane filed this action to enforce the note.

## DISCUSSION

There are two motions pending before the court: (1) Diane's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and (2) Alan's motion for leave to file his Second Amended Affirmative Defenses. The court addresses Alan's motion first.

### I. Motion to file Second Amended Affirmative Defenses

After a party has amended its pleading once as a matter of course, the party may amend the pleading "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Plaintiff has not consented to the amended pleading. (*See* Pl.'s Reply in Supp. of her Mot. for J. on the Pleadings, and Opp'n to Def.'s Mot. for Leave to Amend [40], hereinafter "Reply".) The Federal Rules of Civil Procedure instruct, however, that courts should "freely give

8

leave when justice so requires." FED. R. CIV. P. 15(a)(2).

Justice requires granting Defendant's motion for leave to amend. Defendant's first Amended Affirmative Defenses is a mere six-page document with bare-bones assertions of his legal defenses. (*See* Answer to Compl. and Am. Affirmative Defenses [24].) The Second Amended Affirmative Defenses that Defendant seeks leave to file is a 133-page document with detailed factual allegations to support his claims and supporting exhibits. (*See* 2AD.) Therefore, a fair analysis of Defendant's position requires analyzing the facts in the Second Amended Affirmative Defenses.[6] Accordingly, Defendant's motion for leave to file his Second Amended Affirmative Defenses is granted.

## II. Motion for Judgment on the Pleadings

Plaintiff Diane Israel has moved for judgment on the pleadings. Defendant objects, contending that Diane is not entitled to judgment on the pleadings because Alan has raised three affirmative defenses, which Alan asserts, render the note unenforceable.

A Rule 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004). The pleadings "consist of the complaint, the answer, and any written instruments attached as exhibits." *Housing Auth. Risk Retention Group, Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004); *see also* FED. R. CIV. P. 12(c). Where the plaintiff moves for judgment on the pleadings, "the motion should not be granted unless it appears beyond doubt that the non-moving party cannot prove facts sufficient to support his position." *Hous. Auth.*

---

[6] Diane argues that this court should reject Defendant's motion for leave to amend because it is futile. "District courts may refuse to entertain a proposed amendment on futility grounds when the new pleading would not survive a motion to dismiss." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014) (quoting *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013)). Because the futility analysis would require analyzing the facts in the Second Amended Affirmative Defenses under the same standard as a 12(c) motion, *see Guise v. BWM Mortg., LLC,* 377 F.3d 795, 798 (7th Cir. 2004) (a 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion), the court entertains the Second Amended Affirmative Defenses to evaluate Plaintiff's motion for judgment on the pleadings.

*Risk Retention Grp., Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004).

### A. Lack of Consideration

Alan's first affirmative defense is that the Promissory Note was not supported by adequate consideration. (2AD ¶¶ 60–66.) Diane did not give Alan $182,000, he notes, and because she was already contractually obligated to provide the stock to ACC under the terms of the 2000 Stock Purchase Agreement, her shares of stock do not constitute consideration for the Note. (2AD ¶¶ 61, 63.) Alan continues, "since Diane had no current stock in ACC, had released any claims that may have existed, and had agreed not to sue Alan Israel or ACC, she could offer no consideration in return for her demand to pay her $182,000." (2AD ¶ 55.)

Diane does not dispute that she did not provide stock or $182,000 in return for the Note, nor does she dispute having signed the 2000 Mutual General Release. Even so, Alan has not established that the Note lacked consideration. Diane did not provide a loan or stock and had signed a prior release, but these are not the only forms that consideration can take. "The only consideration required to support a promissory note is 'valuable' consideration which consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *Rybak v. Dressler*, 178 Ill. App. 3d 569, 581, 532 N.E.2d 1375, 1383 (2nd Dist. 1988) (internal quotations omitted). *See also Doyle v. Holy Cross Hosp.,* 186 Ill. 2d 104, 112, 708 N.E.2d 1140, 1145 (1999) ("Any act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract").

Alan cannot establish that the Note lacked consideration because there is evidence of the consideration in the text of the Note, and in the 2005 Settlement Agreement. First, the Note expressly states that it is "FOR VALUE RECEIVED." (Note at 1.) In Illinois, "[t]he recital in a note attached to a complaint that it was given 'For Value Received' is a sufficient allegation of consideration. Moreover, in an action on a validly executed negotiable instrument, consideration is presumed and no further proof thereof is required other than the note itself." *Pedott v.*

*Dorman*, 192 Ill. App. 3d 85, 93, 548 N.E.2d 541, 546 (1st Dist. 1989) (internal citations omitted). *See also JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 866 (7th Cir. 2013) ("A validly executed negotiable instrument is presumed to be supported by consideration. A clause stating that an instrument was given "for value received" ordinarily is sufficient evidence of consideration").

The presumption of consideration is rebuttable, "but the evidence offered in rebuttal must be of a very clear and cogent nature." *Pedott v. Dorman*, 192 Ill. App. 3d at 93, 548 N.E.2d at 546 (1st Dist. 1989); *Rybak*, 178 Ill. App. 3d at 582, 532 N.E.2d at 1383. Alan cannot meet that burden here because specific consideration is identified in the text of the 2005 Settlement Agreement. The 2000 Stock Purchase Agreement obligated Alan to pay Diane $32,000, plus interest, plus 5% of any revenues earned from the real-estate development project in Iowa, up to $500,000, once the development earned $100,000 in revenues. (SPA ¶ 2.) Under the terms of the 2005 Settlement Agreement, Alan's obligation to make these payments was terminated. The 2005 Settlement Agreement specifically acknowledged that the 2005 agreement supplanted the 2000 SPA:

> Diane entered into that stock purchase agreement with Alan and the Corporation dated December, 2000 . . . pursuant to which she sold her shares of stock of the Corporation to the Corporation and Alan and the Corporation agreed to pay Diane Thirty-Two Thousand Dollars ($32,000) plus certain additional consideration; *and Alan and Corporation wish to codify their remaining obligation to Diane*.

(Settlement Agreement at 2) (emphasis added.) The Settlement Agreement continued: "the parties acknowledge and agree that Diane shall be entitled to payment from Alan and the Corporation in the amount of [$182,000] with respect to the Stock Purchase Agreement," thereby "codifying" the remaining obligation. (Settlement Agreement ¶ 5.) Finally, Diane released any claims she had under the original Stock Purchase Agreement, alleviating Alan of his potential liability. Specifically, Diane and Aaron agreed to:

> release, acquit and forever discharge the Corporation and Alan . . . of and from any and all claims, counterclaims, actions, causes of action, suits, proceedings,

11

> charges, debts, accounts, contracts, demands, rights, damages, costs, expenses, judgments, and compensation whatsoever . . . that such parties now have or claim to have against the Debtor Parties or which may hereafter accrue with respect to the . . . the Stock Purchase Agreement.

(Settlement Agreement ¶ 7(b).) Thus, the text of the Settlement Agreement extinguishes Alan's potential liability under the 2000 Stock Purchase Agreement. Diane had a legal right to profits gained from the Project, which she relinquished.

Alan's only response to this evidence of consideration is that, in reality, Diane's interest in the Stock Purchase Agreement had no value. Alan asserts that "by 2005 the Project had not generated any revenue and was mired in debt." (Def.'s Sur-Response in Opp. to Pl.'s Mot. for J. on the Pleadings [45], 2.) In effect, Alan challenges the adequacy of the consideration. But even accepting that Diane "could not have reasonably expected to recover anything under the SPA," she did give up the legal right to a chance to earn profits in the future. "The courts generally will not inquire into the adequacy of consideration, and inadequacy of consideration, as opposed to a total want of consideration, is not a defense as against a claim based on a promissory note." *Rybak*, 178 Ill. App. 3d at 582, 532 N.E.2d at 1383 (internal citations omitted). The factual question of whether the project was likely to earn profits, therefore, does not defeat a motion for judgment on the pleadings. Evidence of consideration on the face of the 2005 Settlement Agreement and the language of the Note itself, which are properly considered even on a pleadings motion, defeat the defense of lack of consideration.

### B.  Release Agreement

Defendant's next affirmative defense is that the Mutual General Release that Alan and Diane signed in 2000 precludes Diane from enforcing the Note, signed in 2005.[7] (2AD ¶¶ 84–

---

[7] Defendant also initially argued that the release in the 2005 Settlement Agreement bars enforcement of the Note, signed as part of the same settlement. Wisely, Defendant appears to abandon that argument; the 2005 release in the Settlement Agreement specifically exempts "claims arising pursuant to the enforcement of this Agreement." (Settlement Agreement at 7(b).)

12

89.) In the Mutual General Release, Diane did agree to release "any and all actions . . . known or unknown . . . whether accruing or arising prior to . . . the date of this Release, or at any time in the future, including . . . claims arising out of or in any way connected with the Purchaser [ACC], the relationship of the parties, the Stock Purchase Agreement, the Project, and/or any other matter." (Mutual General Release at 7(b).) Alan argues that given the broad language of the 2000 Release, Diane is barred from enforcing the 2005 Note because she released "any and all" claims against Alan, including those arising "in the future."

Diane responds, first, by noting the rule that a subsequent claim may be discharged under this release only if it was "within the contemplation of the parties" at the time of signing. (Pl.'s Mem. in Supp. of Her Mot. for J. on the Pleadings [30], 12–13) (citing *Chubb v. Amax Coal Co.*, 125 Ill. App. 3d 682, 686, 466 N.E.2d 369, 372 (5th Dist. 1984) ("a release, no matter how broad its terms, will not be construed to include claims not within the contemplation of the parties").) Alan replies that whether the 2005 Note was within the contemplation of the parties is a disputed question and cannot properly be resolved in a judgment on the pleadings. (Response at 21; Sur-Response at 7.)

Diane has made a second argument, as well: that the 2005 Settlement Agreement "superseded" the terms of the 2000 settlement, and therefore the 2000 Release is no longer effective. (Reply [40], 3.) Alan ignores this second argument, but whether the 2005 Settlement Agreement modifies the earlier agreement is a legal question that this court can properly resolve on a motion for judgment on the pleadings. A "release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts." *Chubb,* 125 Ill. App. 3d at 685, 466 N.E.2d at 372. "Parties to a contract may not be locked into its terms forever. Accordingly, parties to an existing contract may, by mutual assent, modify a contract provided that the modification does not violate the law or public policy." *Urban Sites of Chicago, LLC v. Crown Castle USA*, 365 Ill. Dec. 876, 889, 979 N.E.2d 480, 492-93 (Ill. App. Ct. 1st Dist. 2012).

13

As explained above, the 2005 Settlement Agreement, by its terms was intended "to codify"[8] Alan's and ACC's remaining obligation to Diane under the 2000 Stock Purchase Agreement. (Settlement Agreement at 2.) In the 2005 Settlement Agreement, Diane released any claims she had under the 2000 Stock Purchase Agreement. (Settlement Agreement at ¶ 7(b).) By its terms, then, the 2005 Settlement Agreement modified the earlier settlement agreement reached in 2000, which was set forth in the Stock Purchase Agreement and Mutual General Release. Even if Alan is correct about the meaning of the 2000 Mutual General Release, that Release is no longer operative. The 2005 Settlement Agreement is not ambiguous—it expressly permits an enforcement action like this one. (Settlement Agreement at 7(b)) (releasing most claims, but exempting "claims arising pursuant to the enforcement of this Agreement.")

Finally, the modification was valid. In Illinois, a contract modification is valid if it satisfies all the criteria for a valid enforceable contract: offer, acceptance, and consideration. *Hannafan & Hannafan, Ltd. v. Bloom*, 355 Ill. Dec. 547, 553, 959 N.E.2d 1280, 1286 (Ill. App. Ct. 1st Dist. 2011). As explained above, the 2005 Settlement Agreement, which modified the 2000 Stock Purchase Agreement, was supported by adequate consideration and is therefore a valid modification. Accordingly, the 2000 Mutual General Release cannot, as a matter of law, preclude Diane from enforcing the modification made by the 2005 Settlement Agreement.

**C.   Economic Duress**

Finally, Defendant claims that he only signed the Note under economic duress. He argues that the consequences of losing the financing from State Central Bank and Valley Bank were severe enough to constitute economic duress. "Duress occurs where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the

---

[8] It appears that by the term "codify" the parties meant that the 2005 Settlement Agreement specified the otherwise uncertain amount Alan owed Diane under the earlier agreement.

exercise of one's own free will." *Bank of Am., N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 173–74, 928 N.E.2d 42, 57 (1st Dist. 2010); *see Kaplan v. Kaplan*, 25 Ill. 2d 181, 185–86, 182 N.E.2d 706, 709 (1962). A finding of duress is less likely if the party has the assistance of counsel and adequate time to consider the proposed contractual terms. *J.D. Alexander v. Standard Oil Co.*, 97 Ill. App. 3d 809, 816, 423 N.E.2d 578, 583 (5th Dist. 1981). It "has long been held that where consent to an agreement is secured merely because of hard bargaining positions or financial pressures, economic duress does not exist." *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91, 707 N.E.2d 609, 614 (1st Dist. 1999); *Herget Nat'l Bank of Pekin v. Theede,* 181 Ill. App. 3d 1053, 1057, 537 N.E.2d 1109, 1112 (3rd Dist. 1989). Unless wrongful or unlawful pressure is applied, there is no economic duress. *Hurd*, 303 Ill. App. 3d at 92, 707 N.E.2d at 615; *De Fontaine v. Passalino,* 222 Ill. App. 3d 1018, 1029–30, 584 N.E.2d 933, 940–41 (2nd Dist. 1991). "Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress." *Hurd*, 303 Ill. App. 3d at 92, 707 N.E.2d at 615.

Alan has not alleged that Aaron applied wrongful or unlawful pressure. The closest he comes is the allegation that Aaron threatened to breach their June 8, 2005 agreement. Under Illinois law, however, "[o]rdinarily, a threat to break a contract does not constitute duress, and to infer duress, there must be some probable consequences of the threat for which the remedy for the breach afforded by the courts is inadequate." *Krilich v. Am. Nat. Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 572–73, 778 N.E.2d 1153, 1162 (2nd Dist. 2002) (quoting *Kaplan v. Keith,* 60 Ill. App. 3d 804, 807, 377 N.E.2d 279, 281 (4th Dist. 1978)). Only "[i]f there is no full and adequate remedy from the courts for the breach," may the coercive effect of the threatened action be inferred. *Krilich*, 334 Ill. App. 3d at 572–73, 778 N.E.2d at 1162 (quoting *Kaplan,* 60 Ill. App. 3d at 807, 377 N.E.2d at 280).

Defendant cites two cases as support for his contention that breach of contract may support a claim of economic duress. Neither changes the result here. First, Alan cites *Selmer*

*Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 927 (7th Cir. 1983), a case decided under Wisconsin law. In that case, the plaintiff, a subcontractor, agreed with defendant general contractor that despite defendant's failure to perform on the contract, plaintiff would complete its construction work on the condition that defendant paid costs associated with the delay. *Id.* at 924. When it finished the project, plaintiff demanded $120,000 but defendant refused; facing financial difficulties, plaintiff ultimately accepted $67,000, but later brought suit for the full $120,000. The Seventh Circuit affirmed summary judgment for defendant. The court reasoned that, while Wisconsin courts might recognize economic duress due to a threatened breach of contract in certain situations—specifically, when the legal remedies for the breach are not adequate—plaintiff's financial difficulties did not constitute duress. *Id.* at 927. Plaintiff had the option not to extend the contract, and defendant was not responsible for plaintiff's financial situation. *Id.* at 928–29. *Selmer* confirms that a threatened breach and financial hardship are insufficient to establish a defense of duress. *Id.*

In the second case, an unpublished, nearly 30-year old decision, the plaintiff brought a civil RICO action, not a breach of contract claim. *First W. Mortgage Corp. of Illinois v. Lyons Savings and Loan Association,* No. 86-cv-5855, 1987 WL 10315 (N.D. Ill. April 29, 1987). In dicta, the court stated that "[i]f [defendant's] use of its advantageous bargaining position is actionable, the appropriate claim would be for breach of contract, or perhaps duress." *Id.* at *1. In light of the clear statements from the Illinois Appellate Courts to the contrary, this language does not satisfy the court that a threatened breach of contract suffices to establish economic duress.

Therefore, even accepting his allegations as true and drawing all inferences in his favor, Alan cannot establish economic duress because he has not alleged wrongful action. Aaron's demand for repayment on the loans, and his threatened use of a judicial lien to foreclose on the property were both lawful; the financial pressure created by these actions does not constitute duress. Moreover, the financial pressure Alan faced resulted, at least in part, from his own

16

decisions to hire a contractor and sell lots of the property before closing on the loans and securing financing. The fact that Aaron was not directly responsible for Alan's financial pressures weakens Alan's economic duress claim. *See Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 314 (7th Cir. 1992) ("Driving a hard bargain is not a wrongful act, especially in this case, where [the bank] had nothing to do with putting [Defendant] in a position where he needed the money by the end of the year . . . A borrower cannot charge a lender with economic duress where the pressures on the borrower are the result of his own business decisions and economic conditions.")

Most importantly, Alan's allegations, even if true, do not establish that he lacked a full and adequate remedy from the courts for the breach of the June 8, 2005 agreement. Alan's only support for his claim that his legal remedy would have been inadequate is that it would "require years of litigation, cost thousands of dollars in attorneys' fees," and would result in the loss of the property. But Illinois courts have rejected the argument that the inconvenience of litigation renders a judicial remedy inadequate. *See Krilich*, 334 Ill. App. 3d at 573, 778 N.E.2d at 1163. In *Krilich,* the Illinois Appellate Court addressed a situation where the Plaintiff, Robert Krilich, agreed to sell a lot intended for residential real estate development to Defendant, Bongi Development Corporation. 334 Ill. App. 3d at 566, 778 N.E.2d at 1157. The parties completed the sale and subsequently modified the contract. *Krilich*, 334 Ill. App. 3d at 567, 778 N.E.2d at 1158. Bongi claimed that Krilich employed economic duress during the negotiations by threatening to refuse to meet his obligations, under another agreement, to complete work on another project Bongi was developing. *Krilich*, 334 Ill. App. 3d at 568, 778 N.E.2d at 1159. Specifically, Krilich allegedly knew that Bongi owed millions of dollars on that project and that Krilich's delay jeopardized its success. *Krilich*, 334 Ill. App. 3d at 568, 778 N.E.2d at 1159. The court concluded, however, that Krilich's threat did not constitute duress. *Krilich*, 334 Ill. App. 3d at 573, 778 N.E.2d at 1163. Nor were Bongi's allegations that it faced "financial collapse, bankruptcy, and protracted litigation if Krilich followed through on his threat" sufficient to

17

establish duress. *Krilich*, 334 Ill. App. 3d at 573, 778 N.E.2d at 1163. Although the court acknowledged that "Bongi's damages [in a breach of contract action] would have been substantial," those damages could have been recovered in court. *Krilich*, 334 Ill. App. 3d 563, at 573, 778 N.E.2d at 1163. Alan makes essentially the same argument as Bongi—he asserts that the modification was entered into under duress because the opposing party threatened to cause the loss of a valuable real estate development project. The Appellate Court in *Krilich* clearly rejected that argument. Even if Alan proved all of his allegations, he would not establish a viable claim for economic duress.

Finally, Defendant urges that because economic duress "depends on the factual circumstances surrounding the whole transaction," the court cannot properly resolve this claim on a motion for judgment on the pleadings. (Resp. at 20.) Yet the fact that economic duress is highly fact-contingent need not preclude a judgment on the pleadings. Illinois courts have "frequently held that a claim of duress may be disposed of without an evidentiary hearing." *Krilich*, 334 Ill. App. 3d at 573, 778 N.E.2d at 1163 (2002) (citing *Hurd,* 303 Ill. App. 3d at 88, 707 N.E.2d at 612; *Alexander,* 97 Ill. App. 3d at 816, 423 N.E.2d at 584).

## **CONCLUSION**

Defendant's motion for leave to file his Second Amended Affirmative Defenses [36] is granted. Viewing the allegations in that pleading in the light most favorable to Defendant, however, the court concludes that Alan Israel will be unable to prove any set of facts supporting his affirmative defenses of lack of consideration, release, or economic duress. Plaintiff Diane Israel's motion for judgment on the pleadings [29] is therefore granted and judgment is entered in favor of Plaintiff in the amount of $380,534.07.

ENTER:

Dated: November 25, 2014

REBECCA R. PALLMEYER
United States District Judge